# CHARLESTON.

Thorn *v.* Phares.

Submitted September 5, 1891.—Decided December 12, 1891.

1. TITLE — VENDOR AND VENDEE — EXECUTORY CONTRACT—PURCHASER.

A purchaser of land who has acquired and holds the same by executory contract, duly executed, acknowledged, and admitted to record, has from the time it is thus admitted to record a good title against all subsequent creditors and purchasers. Chapter 74, § 4 Code (Ed. 1891) p 650.

2. Title—Trusts and Trustees

Such subsequent purchaser is regarded and treated in a court of equity as a kind of trustee holding the legal title for such equitable owner as the real and true owner, and will be compelled to convey to him the legal title.

3. Description.

The main object of a d scription of the land sold or conveyed, in a deed of conveyance, or in a contrac' of sale, is not in and of itself to identify the land sold—that it rarely does or can do without helping evidence—but to furnish the means of identification, and when this is done it is sufficient    That is certain which can thus be made certain.    ,

4. Case in which these principles are applied.

*Dayton & Dayton* for appellant.

Holt, Judge :

This is a suit which I shall for the present briefly designate as a "bill in equity," belonging to the general class of bills for specific performance, brought by George Thorn, plaintiff below and plaintiff here, in the Circuit Court of Randolph county, in February, 1888, against William M. Phares, as the grantee and holder of the legal title, with notice, of the land in controversy, of which plaintiff claims to be the equitable owner by written contract of purchase, executed by Mathew L. Ward, the common source of title, duly acknowledged by Ward, and admitted to record according to the statute.    See section 4, chapter 74, p. 550 (Ed. 1891) Code.    On the 28th of January, 1891, the court dismissed the bill as without merit, after final hearing had on bill, answer, replication, exhibits filed, and testimony taken.    I here give the executory contract, found, as it is, in the middle of the deed of conveyance, executed at the same time and in the same way authenticated for record by one and the same act, recorded at the same time and place, as a part of one instrument, under the same law, which gives it the same effect, as to subsequent purchasers, which it gives to the granting part or conveyance of the one hundred and sixty acres conveyed, as well as sold, at the same time.    The following is a copy of the deed :

"This deed, made this 15th day of September, 1875, between Mathew L. Ward and his wife, Amanda Ward, of the

county of Randolph and the State of West Virginia, of the first part, and George Thorn, of the county of Barbour and State foresaid, of the second part, witnesseth, that for and in consideration of the sum of five hundred dollars in hand paid, the receipt whereof is hereby acknowledged, the parties of the first part do grant general warranty unto the said George Thorn, his heirs and assigns forever, the following described tract of land, situated in the county of Randolph and State of West Virginia, lying on the top, and both sides of the top, of the south point of Ball's mountain (or Laurel Hill) about three fourths of a mile north of the Valley River pass, bounded as follows : Beginning at a poplar and hickory, corner of William Elliot's and John Scott's land, on the point of the mountain opposite the Beaver dam ; running thence along the south-east side of the mountain, N., 51 E., 211 poles, to small forked chestnut oak and pointers (on sharp point) on top of a ridge near the head of John Ball's run, N., 50 W. 99 poles, to a small chestnut on top of the mountain ; thence, down the west side of the mountain, S., 88½ W., 139 poles, to a stake near the outside line of the old survey; thence S. 80 poles to a stake in William Elliot's line of his 500 acre survey; thence therewith S., 27 E., 125 poles, to beginning, containing one hundred and sixty acres. It is further understood that the parties of the first part are to convey to the said George Thorn any lands that may fall to said Mathew L. Ward in the partition of lands between him and the heirs and assignees of Whitman Ward, deceased, which may lie adjoining north and north-east of the within described lands, together with their appurtenances, unto the said George Thorn forever, with general warranty.

"Witness the following signatures and seals, this 15th day of September, 1875.

"MATHEW L. WARD. [Seal.]
"AMANDA WARD. [Seal.]

"District of Leadsville, in Randolph county, to wit:

"I, Everett Chenowith, a justice of the district aforesaid, in the State of West Virginia, do certify that Mathew L. Ward, whose name is signed to the writing above, bearing date on the 15th day of September, 1875, ac-

knowledged the same before me in my district aforesaid. Given under my hand this 24th day of September, 1875.

"EVERETT CHENOWITH, J. P.

"State of West Virginia, district of Leadsville, in Randolph county, to wit:

I, Everett Chenowith, a justice of the district aforesaid, do certify that Amanda Ward, the wife of Mathew L. Ward, whose names are signed to the above writing, bearing date on the 15th day of September, 1875, personally appeared before me, in my district aforesaid, and being examined by me privily and apart from her husband, and having the writing aforesaid fully explained to her, she, the said Amanda Ward, acknowledged the said writing to be her act, and declared that she had willingly executed the same, and does not wish to retract it.

"Given under my hand this 24th day of September, 1876.

"EVERETT CHENOWITH, J. P.

"State of West Virginia, Randolph County Court Clerk's office.

"I, James D. Wilson, clerk of said court, in my office on the 18th day of March, 1876, upon the foregoing certificate of acknowledgment of the writing hereto annexed, do admit said writing and certificate to record as to the said Mathew L. Ward and wife, whose names are signed thereto.

Teste: JAMES D. WILSON, Clerk.

A copy from the record. JAMES D. WILSON, Clerk."

Afterwards, viz., on 24th of November, 1886, L. D. Strader, special commissioner in certain chancery suits of Leonard and others, creditors of M. L. Ward, to none of which was Thorn in any wise a party, by deed of that date, and as sold for Ward's debts, conveyed to one Phillip Thomas and defendant, William M. Phares, the purchaser of Ward's undivided five fourteenths interest in said Whitman Ward tract of two thousand acres, less one hundred and seven acres conveyed as aforesaid, as included in the tract of one hundred and sixty acres bounded and described in the deed from Ward to Thorn. Thomas afterwards conveyed his interest therein to defendant, Phares, his co-owner. During this time, and down to the present, we are

bound to presume that Thorn was and has been contin-
uously in the actual possession of the land as a whole—the
one hundred and sixty acre part, and the adjoining part—
claiming it as his own under the executory as well as the
executed part of the instrument ; so that there is no one he
could have sued at law for the possession were the three
hundred acres regarded as conveyed—if that were material,
as it is not—for, in our view, he did not have the legal title
to the land in controversy.

Whitman Ward, the father, died intestate in the year
1862, leaving a widow and eight heirs at law, of whom
Mathew L. Ward was one.   The heirs at various times,
without any partition, undertook to convey to and among
each other certain parts calling for a certain number
of acres, and with definite locations and boundaries, with
or without guaranty. that it should, when partitioned,
be laid off at that place ; and that, if anything additi-
onal should fall to or be assigned as a part of the
grantor's share, it should be laid off adjoining in certain
directions the parts so allowed to be located.

To go into these sales by definite localities and boundaries
is not important now, by reason of the partition ultimately
made,§further than to say that it produced confusion and com-
plexity, which the county surveyor, Nicholas Marstiller, ap-
pointed for the purpose, as a preliminary step before par-
tition could be directed, worked out with more clearness,
apparent accuracy, and painstaking labor than is generally
devoted to that important preliminary step in partition.
This was done in the chancery suit instituted for that pur-
pose in the year 1886, by Washington G. Ward, one of the
eight heirs of Whitman Ward, deceased, against the other
heirs, or their grantees or vendees.

In this suit George Thorn was a party defendant, as well as
defendant, William M. Phares, and his former co-owner,
Phillip Thomas.  The first order was one directing "Nicholas
Marstiller to ascertain and report the lands subject to parti-
tion mentioned in the bill and proceedings, the quantity
thereof,by whom owned, and what interest the several parties
have therein:"    This he did, and made the report already
mentioned.  He went upon the theory not to disturb the local-

izations already made, more than might be necessary to a fair partition, and of assigning to each heir or his vendee his remaining part adjoining these localizations; or where, on the faith of some such understanding, one or more had commenced improvements; and he particularized the place where the general scheme he followed should be departed from rather than in the other places. He supposed that the six hundred acres localized across the northern end could be left out and assigned as it was already set off; the same as to two hundred and thirty five (found to be two hundred and seventy two acres) having been before that set off to M. L. Ward in the southern end; the same as to the one hundred and sixty acres of M. L. Ward, as far as it went in making up his share, which had been increased by purchase to five fourteenths; the same as to the Hinkle and Johnson Phares lot, vendees of Harper, of two hundred and thirty nine acres, except that, if the exigences of a fair partition required it, the southern boundary of the last named lot should be subject to change first. He found one thousand, one hundred and sixty nine acres still requiring partition and definite location, although the general location had in a certain way been already agreed upon or understood among the heirs, as, for example, any part still coming to M. L. Ward was to be north east of his two hundred and thirty nine acres in the lower end.

All this he reported, together with many other details necessary to enable the court to act intelligently in making the partition, but not necessary here, as having any bearing on the question before this Court for decision. He divided the land into one thousand, one hundred and sixty nine parts, corresponding with the number of acres left unlocalized, as the basis of the ascertainment of interests; and of these one thousand, one hundred and sixty nine interests in value he reported Phillip Thomas and William M. Phares as jointly entitled to 539–1169, their part in value of the tract of one thousand, one hundred and sixty nine acres, less the interest in said land conveyed by Mathew L. Ward to George Thorn. Said unascertained residuum belonging to M. L. Ward was to be laid off on the north east side of said two hundred and thirty five-acre tract, as provided in

the deed of certain heirs and their assignees to said Mathew
L. Ward. That of the one hundred and sixty acres of land
conveyed by M. L. Ward to George Thorn, about one hun-
dred and seven acres (afterwards found to be but ninety
seven acres) are within the boundaries of the tract of one
thousand, one hundred and sixty nine acres ; "and the said
Ward had no authority to convey the same in severalty, he
only owning an undivided interest, which, by the deed to
him, was to be laid off to him, as above stated, on the north
east side of his two hundred and thirty five-acre tract, and
that one hundred and seven acres so conveyed to Thorn
lies on the north west side of said two hundred and thirty
five-acre tract."

Here his report closes, accompanied by a very use-
ful, I may say indispensable, map, a blue-print copy
of which, found in the record here, enables the court
to see clearly how the land lies, and the different lots, as
well as to appreciate the results of his labors. This was
followed by the usual order of 2d June, 1886, confirming
his report as to the undivided interest each one was en-
titled to in the one thousand, one hundred and sixty
nine acres ; and then directing "Nicholas Marstiller, sur-
veyor of lands for the county of Randolph, A. D. Cap-
linger, and George M. Lough, who are appointed com-
missioners for the purpose to go upon said land, and make
partition thereof between the parties according to their
respective interests ascertained as aforesaid, taking into
consideration quantity and value, and, if practicable, as-
sign to the said George Thorn his interest in said tract of
one thousand, one hundred and sixty nine acres according
to the boundaries of his interest indicated on said plat, one
hundred and seven acres, and make report thereof, and ac-
company the same with a plat indicating areas and bound-
aries."

On the 25th of April, 1887, these commissioners had
finished their labors ; and on 23d September, 1887, their
report and accompanying plat (also here by copy in blue
print) are noted as filed by order of that date ; and ex-
ceptions not necessary to be noticed, were taken by Thorn,
for the court on that day, on final hearing of the cause,

98

overruled the exceptions, and decreed that the said report of partition be confirmed—decreeing, among other things, that George Thorn do take and hold in fee-simple, free from the claims of the other parties to this suit, lot No. 1, indicated on the plat, and containing ninety seven acres, being the part of the boundary of land conveyed to the said Thorn, and bounded *etc.;* "that the defendant, William M. Phares, do take and hold in fee-simple, free from the claims of the other parties to this suit, lot No. 2, indicated on said plat, containing three hundred acres, and bounded" *etc.;* a large part of which lies north and north east of the one hundred and sixty acres under any construction, running, it seems, with five lines of the two hundred and thirty five-acre tract; thence with three of the lines of the one hundred and sixty-acre tract on the north and the north east side of certain parts thereof, and back to the beginning; but, it appearing that Thomas had conveyed his interest to defendant, Phares, the whole three hundred acres is assigned to Phares. The court, under our statute, (section 1, c. 79) could, and perhaps ought to, have settled this controversy as to the land on the north and the north east side of the one hundred and sixty acres which Ward had agreed to convey to Thorn by contract contained in his deed of 15th day of September, 1875, but for some good reason the court declined to do so, and closed the decree as follows : "And this decree is to be without prejudice to the right and title of George Thorn to all or any part of the three hundred acres herein allotted the said William Phares, and in any controversy with the said Phares therefore that may properly be had between the said claimants."

These are the facts, and all the facts, bearing with any weight upon the question involved in this suit. In such a state of facts, to destroy or deny or take away, or in effect transfer to another a man's equitable ownership of land created and made known to all the world in the same way, and with the same effect, so far as subsequent purchasers are concerned, as the legal ownership of the one hundred and sixty acres is created and made known, the former as real and substantial in a court of conscience as the latter, and within such court's peculiar protecting and preserving

power; to do this by reason of things which took place behind his back, and as to which he had no opportunity to be heard, never having had his day in court, except in a second suit in which his right and title is expressly saved to him and to be without prejudice, who is in visible ownership, yet comes promptly into the proper court seeking the right thus saved—such a denial, if well founded, must be based upon some fact of rare occurrence.

I am sure the learned judge who tried this cause in the first instance gave the plaintiff a fair and impartial hearing; yet, as sometimes happens, as we know, he has in this instance leaned heavily upon some broken reed; or else, after careful search, we have, as sometimes also happens, not been able to find or justly appreciate when found, a support sufficient to uphold such decree. In fact, as far as I can see, it is without any substantial support at all, unless it be one of those now to be mentioned. If it rests upon the statement made by Commissioner Marstiller in the closing part of his preliminary report, that "the said M. L. Ward had no authority to convey in severalty the one hundred and seven acres, that part of the one hundred and sixty acres within the undivided balance of the one thousand one hundred and sixty nine acres, "the same can be said of nearly one half of the Whitman Ward tract of two thousand acres, which was conveyed in severalty by metes and bounds by various deeds, in no one of which all the other co-owners join.'

To partition the land according to law, and yet hold good, or at least disturb as little as possible, these unauthorized localizations of undivided interests, was, if it could be fairly carried out, the painstaking scheme carefully devised, and, all things considered, not imprudently adopted; and it may, notwithstanding the great danger of going wrong unwittingly, yet perhaps without serious error, have been carried out. At any rate, no one is heard to complain, or, if so, his complaint has not been heeded. Still it would not be hard to show some things not generally tolerated in partition suits, if not some grave errors of doubt and obscurity; at least. For example, who Mathew W. Ward called an "heir" in the report of partition is, I am in grave doubt. I would have thought him to be Mathew L. Ward, with an

unimportant change of initial of some middle name, had I not found that by that name, according to said report, he joins in the conveyance of the two hundred and thirty five-acre tract in intended severalty to Mathew L. Ward, and that in the final decree of partition nothing is expressly assigned to him or to any vendee of his; yet it is stated in said report that his interest in the six hundred-acre part of the two thousand-acre tract was conveyed to Ellias W. Kittle by deed dated 18th April, 1887, a date seven days prior to the report; and the commissioners do not assign this interest to any one, for the reason, as I indirectly infer from Mr. Marstiller's notice, "that he is not a party to the suit," and for the further reason that the six hundred-acre tract is not taken directly into the partition, because perhaps treated as effectually localized.

Again, M. W. Ward is mentioned in said report as having joined in a deed of conveyance to Archibald E. Harper of Squire B. Ward's interest in the two thousand acres, and as having covenanted and agreed that such interest should embrace and include that portion of the above-mentioned survey which adjoins the land now owned by the said A. E. Harper, being at the north end *etc.* Mathew L. Ward does not join in this deed; and so, again, M. W. Ward joins in another deed to Mathew L. Ward. The names of all the children and heirs at law of Whitman Ward are professedly given, and yet the name "Mathew W. Ward" and " M. W. Ward" does not anywhere appear in such list, nor is there anything in pleadings, evidence, or reports to show that, not being an heir, he obtained in some way an interest from some one who was an heir. This may have been important, and certainly is obscure, to say the least.

But enough of this; nobody complains or can now complain. Again, and this is decisive on this particular point, whatever may have been the binding force of a conveyance from seven of the eight heirs (including M. W., who would make nine) to M. L. Ward, that his remaining part, when assigned, should adjoin the two hundred and thirty five-acre tract on the north east, and therefore, as is said, could not include any part of the one hundred and sixty acres, nevertheless the commissioners of partition laid off and con-

ditionally assigned such interest, and the court expressly confirmed it, as containing three hundred acres, reaching from the south east corner of the two thousand-acre tract in a north west direction to the outside line on the west, running north and south ; thus cutting off into the south-west corner both the one hundred and sixty and two hundred and thirty five-acre tracts, and making a large part of it either north or somewhat north east, giving the vendee the benefit of a favorable meaning, and adjoining the one hundred and sixty-acre tract, and coming literally within the terms of Mathew L. Ward's contract to convey the same to George Thorn, and for which Thorn had paid him. What boots it to say that the unauthorized contract which undertakes to declare that this unascertained residuum, of size unknown, has thus been localized, by saying it shall lie north east of the two hundred and thirty five-acre tract, when, as we now see, that would be a mathematical and physical impossibility, unless we materially reduce it in quantity and value? for, if partitioned strictly to this "un-authorized" localization, it would thrust out of place some other unauthorized location made in advance of partition, of some other residuum of unknown quantity, and thus up-set this scheme of partition devised in good faith by the surveyor, recommended by the commissioners, and adopted by the court, for the purpose of observing, as far as might be, these "unauthorized" localizations, at one time and another desired by a majority of the heirs.

Again, it might be inferred from defendant's answer, that he in some way had acquired from the other co-owners a right to the space as vacancy now occupied in severalty by the three hundred acres. But how could the trustee (de-fendant, Phares) acquire such a right as that, if the court thought proper to lay off plaintiff's land at that place, and become thereby entitled in equity to hold such land hence-forth for himself and against the true equitable owner ? But, notwithstanding such a pretension, it could, with some plausibility, at least, be said that the three hundred acres could and ought to be divided by a line which would be almost a prolongation of the N., 51 E., line of the one hun-dred and sixty-acre tract through the three hundred acres,

thus giving to plaintiff only the part lying west of such extended line. But this need not be elaborated, for a majority of the court are of the decided opinion that it was the intention of Ward, by his contract as fairly interpreted and applied to its subject-matter, to sell to Thorn the whole of his indefinite and unascertained residuum, whatever it might be, which he had agreed might be laid off in that part of the two thousand-acre survey; and that he laid off and described and conveyed what he supposed was a safe quantity by metes and bounds, and described the remainder, if any more "should fall to him in a partition between him and the heirs," by terms necessarily general, yet showing with sufficient certainty that no part was to remain for him of such indefinite and unascertained residuum. The two hundred and thirty five acres, being included in the "Home Farm," as a part thereof, was sold under decree, and bought by George M. Lough. The description of the land sold was as certain as it could be made. The one hundred and sixty acres was laid off and designated by metes and bounds. The residuum adjoining on the north and north east side, which might fall to him in the partition of land between him and the other heirs of Whitman Ward, deceased, and their assignees, was capable of being made certain whenever such partition should be made, as was thereby afterwards thus made definite and certain by metes and bounds on every side. It is a mistake to suppose that the deed of conveyance or the contract of sale must, in and of itself, identify the land sold or conveyed. This it rarely ever does. "But it furnishes the means of identification, and when this is done it is sufficient." When a subsequent purchaser, whether for value or not, whether by deed with covenants of general warranty or of special warranty, whether with or without actual notice or knowledge of the prior purchaser's equitable title by contract executed, duly acknowledged, and admitted to record (as in this case) acquires the legal title, a court of equity regards him and treats him as a trustee, holding the same for the real and true owner, and bound to convey it to such equitable owner when properly requested. Such is this case now before us.

The decree complained of is therefore reversed and set

aside, and the cause remanded to the Circuit Court of Randolph to carry out this decision, causing defendant, William M. Phares, to convey with special warranty in fee-simple to plaintiff, George Thorn, or to his heirs, the three hundred acres of land in the bill, and proceedings mentioned, within some reasonable time by the court to be fixed, and in default thereof cause the same to be conveyed by a commissioner appointed for the purpose.

REVERSED. REMANDED.